**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:  21-CV-952

SHANTA LOECKER,

    Plaintiff,

vs.

COLORADO MESA UNIVERSITY and
BOARD OF TRUSTEES FOR COLORADO MESA UNIVERSITY

    Defendants.

---

### COMPLAINT AND JURY DEMAND

---

COMES NOW Plaintiff Shanta Loecker, by and through her attorneys, Newkirk Zwagerman, P.L.C. and Matthew C. Ferguson Law Firm, P.C., and for her causes of action states:

#### INTRODUCTION

1.    Plaintiff Shanta Loecker brings this employment discrimination action against Colorado Mesa University ("CMU") to seek redress of CMU's violation of her rights under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 ("Title VII") and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), both of which prohibit gender discrimination.

2.    Title VII protects employees from gender-based and race-based discrimination in the terms and conditions of their employment.

3.      Title IX prohibits sex discrimination in education and related activities, and it applies to claims of sex discrimination in certain employment situations, including coaches, administrators, and academics. 20 U.S.C. § 161; 34 C.F.R. part 106, Subpart E.

4.       Shanta Loecker was a successful lacrosse coach, having coached at the collegiate level for more than a decade.

5.      Her career was struck down by gender bias and stereotypes that have plagued female college coaches, particularly female coaches of color who are affected by the intersection of gender bias and race bias.

**Risks of Gender Stereotypes**

6.      Female coaches at institutions across the nation are at a high risk of gender bias adversely affecting the terms and conditions of employment.

7.      Female coaches of color are at an even higher risk of gender bias.

8.      A female coach is judged differently and more harshly by her student athletes and their parents.

9.      A female is expected to behave in a manner that is consistent with societal stereotypes about females. If she behaves in a stereotypically feminine manner, then she is blamed for being too soft as a coach. If she behaves the way we expect good coaches to behave, then she is blamed for being too harsh.

10.      These double standards result in student-athlete complaints that are the direct result of gender bias. A university that relies, in whole or in part, upon complaints generated by bias or stereotypes is liable for gender discrimination.

11.     Racial stereotypes exacerbate the risk to female coaches of color, whose behavior is even further misperceived as too harsh.

12.     Universities also react and respond differently to student athletes based on their gender. They coddle and patronize female athletes, while ignoring or overlooking male athletes who raise complaints about legitimate concerns. This result is discriminatory based on gender and harms both male and female student athletes.

13.     The result of these double standards put male athletes at risk (because their complaints are ignored) and place female coaches at risk (because they receive more complaints and are held to a higher standard).

14.     Any of these biases and stereotypes—relying on biased student-athlete complaints against coaches, treating the complaints of female athletes differently than those by male athletes, or holding female coaches to double standards—are all forms of gender discrimination that violate the purpose and scope of Title VII and Title IX.

**Segregation of Women's Sports/Leadership Roles as Evidence of Stereotypes**

15.     Women remain, disturbingly, segregated in college athletics.

16.     Statistics show that 75% of athletic directors are male, 97% of men's teams are coached exclusively by men, and 57.1% of women's teams are coached by men.[1]

17.     The numbers at CMU are even more stark.

18.     CMU has 27 varsity sports: 14 men's teams and 15 women's teams. Within this, 12 sports are "merged," which means the men's and women's teams are ran more as one program

---

[1] Acosta, R.V. and Carpenter, L.J., *Women in Intercollegiate Sport: A Longitudinal, National Study, Thirty-Seven Year Update* (2014) *available at* www.acostacarpenter.org.

and are coached by the same head coach. These sports are cheerleading, cross country, swimming and diving, track and field, tennis, and triathlon.

19.     All 7 men's-only teams are coached by men. For at least the last 10 years, no woman has coached a men's team. All except 1 are white.

20.     All 12 merged teams are coached by men. For at least the last 10 years, no woman has coached a merged team. All are white.

21.     Of the 8 women's teams, 6 are coached by men. All are white.

22.     The merged teams have a total of 13 coaches (5 head coaches and 8 assistant coaches). Only 1 of them (an assistant track coach) is a woman.

23.     Bryan Rooks (male) and Kris Mort (female) serve as Co-Athletic Directors. However, the other 3 athletic department administrators and all 4 department heads are male. All except 1 are white.

24.     The gender segregation in college athletics is not "separate but equal"; rather, it is one-way segregation that gives men exclusive access to coaching men and disproportionate access to coaching women.

25.     Regardless of physical differences between male and female athletes, there is no reason (other than gender stereotypes) for a university to exclusively recruit and hire men to coach men while permitting men to also hold a majority of the coaching positions on women's teams.[2]

---

[2] "Based on our results and other findings that have examined the impact of head coaches on teams' and players' peformances, it appears that both men and women are readily equipped for success in the coaching profession (and is some cases, women coaches have been more successful than the male coaches they replace. As such, our results imply that the absence fo women coaches for men's teams is not grounded in any objective or reliable evidence." Darving, L., Pegoraaro, Al., & Berri, D., *Are Men Better Leaders? An Investigtion of Head Coaches' Gender and Individual Players' Perfrmance in Amateur and Professional Women's Basketball*, Sex Roles.

26.     Continued, one-way segregation is strong evidence of gender stereotypes within each university and, if not addressed, it will continue to exacerbate existing gender stereotypes that harm women like Coach Loecker.[3] It is prohibited by Title IX. *See* 34 C.F.R. § 106.51(a).

**Title IX: Imbalances as Evidence of Gender Stereotypes & Interrelation with Title VII**

27.     Per its 2018 EADA report, CMU is grossly out of compliance with Title IX.

28.     Title IX requires, among other things, equal participation opportunities for male and female students. In simple terms, this means that if exactly half of the students at a university are female, then half of the university's athletes must be female.

29.     Instead, in 2018, approximately 52.7% of CMU's students were female while only 38.3% of its athletes were female. In other words, CMU would have needed to add a staggering 260 participation opportunities for women in order to be compliant with Title IX.

30.     The purpose of Title IX was to address the long-standing negative consequences of gender stereotypes—how society traditionally expects women to behave in athletics.

31.     The failure to comply with Title IX contributes to athlete dissatisfaction and is further evidence that gender stereotypes existed, and continue to exist, at CMU.

32.     Title VII forbids discrimination because of sex against any individual in hiring or "with respect to [their] compensation, terms, conditions, and privileges of employment . . . ." 42

---

78:455–66 (2018) (internal citations omitted).

   [3] "[A 2008 study] found not only that women have less access to positions as head coaches, but also than when women are able to obtain these positions, they are not treated with the same level of respect that their male colleagues are afforded. Processes such as these reinforce the subconscious formation of leadership stereotypes and serve to perpetuate sport as a gendered space. These stereotypes often exist despite a lack of evidence and objective measurements of coaching performance." *Id.*

U.S.C. § 2000e2(a)(1). Title VII also makes it an unlawful practice for an employer "to limit, segregate, or classify . . . employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise affect [their] status as an employee . . . ." 42 U.S.C. § 2000e2(a)(2).

33.    Title IX prohibits sex discrimination in educational programs and activities receiving federal financial assistance, and also applies to a claim of sex discrimination in employment.

34.    Title IX applies to the employment of coaches, administrators, and academics and states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681.

35.    Title IX regulations specific to employees were promulgated by congress. See 34 C.F.R. part 106, Subpart E. *See also N. Haven Bd of Educ. v. bell*, 456 U.S. 512, 512 (1982) (noting that "subpart E regulations promulgated in connection with title IX are valid.").

36.    The U.S. Department of Education also adopted guidance[4] interpreting Title IX to cover and protect employees of educational institutions.

37.    Title IX's legislative history makes clear that Title IX's gender discrimination prohibition applies to the employment of coaches, administrators, and academics. See Simpson, Lynda Guild, Sex Discrimination in Employment under Title IX, U. Chi. L. Rev. Vol. 48: Issue 2, Article 8.[5] *See also* 14 C.F.R. § 1253.500(a) and 34 C.F.R. § 106.51(a) ("No person shall, on the

---

[4] *See* Title IX Resource Guide, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf.
[5] Available at: https://chicagounbound.uchicago.edu/uclrev/vol48/iss2/8.

basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in employment, or recruitment, consideration, or selection therefor, whether full-time or part-time, under any education program or activity operated by a recipient that receives Federal financial assistance.").

38.     Title IX regulations make clear that Title IX's gender discrimination prohibition applies to Defendant's employment decisions including, but not limited to, decisions regarding hiring, promotion, consideration for and award of tenure, demotion, rates of pay or any other form of compensation, and changes in compensation. 14 C.F.R. § 1253.500(b)(1)–(10), 34 C.F.R. § 106.51(b)(1)–(10).

39.     Courts have held that subjecting an individual to sex stereotyping constitutes sex discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989). The Supreme Court explained: In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be, for example, aggressive, has acted on the basis of gender.[6]

40.     Sex stereotyping also violates Title IX's prohibition of discrimination on the basis of sex. (U.S. Depart. of Justice – Title IX Legal Manual).

<u>**JURISDICTION AND VENUE**</u>

41.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

42.     This Court has jurisdiction to provide declaratory and other relief pursuant to 28 U.S.C §§ 2201 and 2202.

---

[6] Gender stereotyping has been fully recognized in this District: *EEOC v. A&E Tire, Inc.*, 325 F. Supp. 3d 1129, 1134 (D. Colo. 2018) (recognizing sex stereotyping and applying *Price Waterhouse*).

43.     Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b) because the events forming the basis of Plaintiff's claims occurred in Grand Junction, Colorado, which is within the jurisdiction of this Court.

44.     Plaintiff has exhausted her administrative remedies by timely filing a charge of discrimination with the EEOC and receiving a Right to Sue Letter. This action is being bought within 90 days from the issuance of the Right to Sue. (**Exhibit A**).

## THE PARTIES

45.     Coach Loecker is a citizen and resident of Illinois.

46.     At all material times, Coach Loecker was an "employee" of CMU as defined by Title VII and Title IX.

47.     Coach Loecker is a South Asian woman who was born in India and later adopted by an American family.

48.     Defendant CMU, a Colorado public university, is an educational institution receiving federal financial assistance.

49.     At all material times, CMU was an "employer" as defined by Title VII.

50.     Defendant Board of Trustees of Colorado Mesa University (the "Board") is a body politic and corporation authorized and existing under the authority of C.R.S. § 23-53-102 and the laws of the State of Colorado.

51.     Defendant Board is capable under the law of being sued in this Court, with said Board being charged with the responsibility for governance of all affairs of CMU. C.R.S. § 23-53-102.

## STATEMENT OF FACTS

52.     CMU hired Coach Loecker in August 2018 to serve as the head coach of its women's lacrosse team, which competes as an NCAA Division II member in the Rocky Mountain Athletic Conference.

53.     Prior to being hired at CMU, Coach Loecker had been coaching college lacrosse for 12 years, including 10 as a head coach.

54.     At the time CMU hired Coach Loecker, she was the only female coach at CMU and the only coach of color.

55.     One of the first red flags Coach Loecker noticed (beyond the general lack of diversity) when she arrived at CMU was that her predecessor (also a woman) was regularly and openly spoken of in a stereotypical and negative manner (e.g., she was "volatile," "emotional," "loud," etc.).

56.     During one of these instances, in the fall of 2018, Co-AD Mort (the only female in the athletics department) told Coach Loecker that if she could get away with hiring only men, she would because women are "too emotional" and "difficult."

57.     This was a sentiment that Co-AD Mort would express more than once during Coach Loecker's tenure at CMU.

58.     Mr. Rooks also made numerous comments implying that it was harder for administrators to manage female coaches than male coaches because coaching was a better fit for males.

59.     The lack of racial and ethnic diversity was also problematic.

60.     On approximately 5 occasions, Co-AD Rooks told Coach Loecker the exact same story in which he related a time Black student athletes had asked him where in the predominantly white town of Grand Junction could they get their hair done and Mr. Rooks expressed confusion over how to handle the situation (he also did not know where the student athletes could go).

61.     Coach Loecker never heard Mr. Rooks tell this story to anyone else, instead he repeated this story only to her, the only person of color in the athletics department.

62.     In general, Co-AD Rooks tended to single out Coach Loecker for discussions on issues involving race and identity and once even told the football coach to talk to Coach Loecker about issues involving transgender athletes.

63.     Coach Loecker is cisgender, and these types of conversations were indicative of those within the department "othering" Coach Loecker.

64.     Despite this adverse environment, Coach Loecker and her team excelled.

65.     In her first season leading the CMU program, Coach Loecker guided the team to a 15-4 record, with a first-round NCAA tournament win and a second round that was lost by just two goals.

66.     Additional accomplishments achieved during her tenure include: An overall win-loss record of 17-6 (.739); first shutout in program history; highest national ranking in program history (10th); highest regional ranking in program history (3rd); first NCAA tournament appearance in program history; 2 All-Region Selections (first in program history); 2 All-American Selections (first in program history); and 3 consecutive semesters with a team GPA exceeding 3.5.

67.     In the spring and summer of 2019, 6 players left the team: 3 left for medical reasons, 2 no longer wanted to play lacrosse, and one was not satisfied with the amount of playing time Coach Loecker assigned her.

68.     This type of player turnover is not uncommon, especially when a team transitions to a new coach.

69.     Coach Loecker's work environment drastically deteriorated the following school year after a confrontation with the men's soccer coach in September 2019.

70.     On September 18, 2019, lacrosse assistant coach Ashley DeLaney prepared for practice by setting up the team camera in the press box while the men's soccer team was finishing their practice. This has been done before every practice at approximately the same time for nearly a year.

71.     On this day, however, the men's soccer assistant coach yelled at Ms. DeLaney to get off the field while the men's team was still practicing.

72.     Shocked and confused (Ms. DeLaney was in the press box, not on the field), Ms. Delaney left the area and spoke with Coach Loecker.

73.     Coach Loecker then went to talk to the head soccer coach to clear up any confusion

74.     When Coach Loecker approached Mr. Padgett he became verbally and physically aggressive, telling Coach Loecker that she had "better watch it" and that he had "six years on her."

75.     Meanwhile, Mr. Padgett's assistant stepped very close to Coach Loecker and yelled at her, forcing her to ask him to step back because she felt threatened, which further enraged the assistant.

76.     The altercation finally ended when the lacrosse players began entering the field, resulting in the soccer coaches retreating.

77.     After lacrosse practice, Coach Loecker texted Co-AD Mort and told her that the soccer coach had been severely disrespectful and that she would like to have a meeting to discuss.

78.     Coach Loecker was able to discuss the issue with Ms. Mort and Mr. Rooks later in the day. She explained what had happened and asked for support.

79.     Ms. Mort offered no assistance and instead told Coach Loecker a story of how the men's baseball coach (Chris Hanks) once pounded his chest like a gorilla in front of her. The implication being that Coach Loecker, as a woman, just needed to deal with that kind of behavior from male coaches.

80.     Mr. Rooks said the only solution was for her and Ms. DeLaney to ensure they did not go onto the field during the men's practice times (which they had not).

81.     Both Mr. Rooks and Ms. Mort encouraged Coach Loecker to *not* report the incident to Human Resources or anywhere else.

82.     Mr. Padgett was never spoken to about, let alone disciplined for, the incident. Instead, Coach Loecker's work environment greatly deteriorated after she reported Mr. Padgett's obnoxious behavior.

83.     Prior to the incident with Mr. Padgett, Co-AD Mort was not easy to get a hold of even though she was Coach Loecker's immediate supervisor. After the incident, however, Ms. Mort became almost impossible to get a hold of and provided Coach Loecker with little support and assistance.

84.    Coach Loecker was not invited to social events hosted by those within the department.

85.    She was criticized (or called intimidating) for dressing professionally and putting in extra hours at work.

86.    As the team geared up for the 2019–2020 season, five student athletes left the lacrosse program for various reasons.

87.    In October 2019, two players quit the lacrosse team. Both struggled with mental health issues and the time commitment required of being both a student and an athlete. Coach Loecker, while sad to see them go, supported their decisions and offered whatever support she could.

88.    In January 2020, an extremely talented player had to leave the team due to a severe medical issue related to a long-term eating disorder.

89.    Coach Loecker had sought help for this student athlete from administration regarding nutrition and mental health but received no support. Eventually, the condition became so severe that the student athlete could not be medically cleared to play.

90.    The fourth student athlete left in January 2020 because she was struggling academically and chose to leave to focus on her studies.

91.    The fifth and final student athlete left in February 2020. This student athlete had caused problems with the team dynamic and had threatened to quit the team on numerous occasions prior to her final decision to quit.

92.    Around this time, Ms. Mort, out of the blue, asked Coach Loecker if she had ever referred to any of her players as "narcissistic fucking brats."

93.     Astounded by the question (because she would never refer to her athletes in that way), Coach Loecker told Ms. Mort that she said no such thing, but that if Ms. Mort was at all concerned about Coach Locker's coaching methods, Ms. Mort could attend practices and/or watch previous practices, all of which were videotaped.

94.     Ms. Mort never attended a lacrosse practice, and to Coach Loecker's knowledge, never reviewed recordings of previous practices.

95.     On or about March 13, 2020, the lacrosse season was officially cancelled due to the COVID-19 pandemic.

96.     On April 3, 2020, Ms. Mort and Mr. Rooks blindsided Coach Loecker when they arranged a conference call and summarily fired her.

97.     During the phone call, they told Coach Loecker that she had created a negative culture and that there had been complaints from players and parents regarding Coach Loecker's coaching methods.

98.     While Ms. Mort and Mr. Rooks declined to give many specifics regarding purported allegations against Coach Loecker, they made vague references to a "culture of exodus" from the program, players being required to report how many calories they ate, and players being overburdened by the difficulty of the lacrosse program.

99.     Ms. Mort and Mr. Rooks also knew or should have known that any of the purported complaints against her were either patently false or extremely exaggerated and taken out of context.

100.    Mr. Mort and Mr. Rooks also knew or should have known that the white male coaches at CMU engaged in the same (or more extreme) behavior as Coach Loecker and are not punished.

101.    For instance, Coach Loecker did not refer to her athletes as "brats." However, it is widely known that the baseball coach uses disparaging and offensive remarks toward his players, including "faggot" and "pussy," and this coach has not been disciplined, let alone fired.

102.    Additionally, Coach Loecker did discuss caloric intake with some of her players, as does any college coach because proper nutrition is vital to athletic performance.

103.    In particular, Coach Loecker spoke with several athletes about the importance of athletes eating enough calories to give them proper energy for workouts and competitions. However, none of these discussions included any requirements that the athletes report to Coach Loecker, or anyone else, their calorie intake.

104.    Conversely, the men's baseball coach requires his players to undergo weigh-ins and punishes players who do not meet the requirements.

105.    It is widely known that many of his players consider this practice be humiliating. Again, he has never been disciplined, let alone fired for this practice.

106.    Similarly, it is widely known that the men's and women's tennis coach regularly had difficult and frank discussions with his female athletes regarding getting enough calories, proper nutrition generally, and eating disorders.

107.    Again, this coach has never been disciplined for having these types of conversations with his athletes.

108.     Finally, while 11 players did quit over the course of two seasons, this kind of turnover should not have been unexpected given the transition between coaches and the fact that many of the departures were completely outside of Coach Loecker's control (e.g., departures due to medical and mental health needs).

109.     More importantly, CMU tolerates far more significant turnover from white and/or male coaches.

110.     For instance, the men's lacrosse coach regularly and purposely cuts 20–30 student athletes from his roster *every season*.

111.     In firing Coach Loecker, CMU held her to a higher standard than any of its white and/or male coaches.

112.     Coach Loecker was ultimately replaced by a white female who was lesser qualified because she had not recently been a head coach of a collegiate program.

## COUNT I
### Gender Discrimination, Race Discrimination, and Retaliation in Violation of Title VII

113.     Coach Loecker re-alleges all preceding paragraphs as if fully set forth herein.

114.     Coach Loecker has satisfied all conditions precedent for bringing suit under Title VII.

115.     Under Title VII, it is unlawful for an employer to discriminate against an employee on the basis of sex or race and to retaliate against an employee for engaging in protected activity.

116.     At all material times, CMU was an "employer" within the meaning of Title VII.

117.     Defendant's conduct was discriminatory against Coach Loecker with respect to failing to treat her equally to male and/or white coaches and holding her to different and higher standards than male and/or white coaches.

118.    Defendant discriminated against Coach Loecker on the basis of sex and race in violation of Title VII by holding her to a different standard than similarly situated white, males in the terms and conditions of her employment, including but not limited to:

      a.   The oversight and management of her team;

      b.   The institutional support provided to her;

      c.   How she coached her players;

      d.   In the evaluation of player complaints; and

      e.   By firing her.

119.    Upon information and belief, Defendant's failure to conduct a proper and unbiased investigation of the allegations made against Coach Loecker is motivated, at least in part, by Coach Loecker's sex and/or race.

120.    Upon information and belief, Defendant's termination of Coach Loecker was motivated, at least in part, by Coach Loecker's protected complaint of discriminatory treatment by a fellow coach.

121.    On information and belief, in discriminating and retaliating against Coach Loecker, Defendant acted with malice or in reckless disregard of Coach Loecker's rights.

122.    As a result of Defendant's conduct, Coach Loecker suffered loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out of pocket expenses.

123.    The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII including, but not limited to:

      a.   reinstatement of Plaintiff to her position as head coach, or front pay;

    b.   training for the coaches and staff of the athletic department on discrimination, with a special emphasis on race and gender;

    c.   training on race and gender bias for current and incoming student athletes and their parents; and

    d.   such other and further relief as the Court deems necessary to effectuate the purpose of Title VII.

**WHEREFORE**, Coach Loecker requests reinstatement; lost wages and benefits; compensatory damages for loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenient and damage to her reputation, and out-of-pocket expenses; punitive damages, equitable relief; any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purpose of Title VII; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

### COUNT II
### Gender Discrimination in Violation of Title IX

124.    Coach Loecker re-alleges all preceding paragraphs as if fully set forth herein.

125.    Under the provisions of Title IX, it is unlawful for an employer to discriminate against an employee on the basis of sex and to retaliate against an employee for engaging in protected activity.

126.    Defendant's educational programs and activities receive federal financial assistance within the meaning of Title IX.

127.    Coach Loecker was denied the benefit of and subjected to discrimination in the Defendant's education programs and activities.

128.    Coach Loecker's denial of benefits and subjection to discrimination were based on her sex and the sex of the athletes she coached.

129.    Title IX regulations require Defendant to take such remedial action as is necessary to overcome the effects of sex discrimination in violation of Title IX.

130.    Defendant violated Coach Loecker's rights under Title IX by:

      a.   Holding her to different and higher standards than her male counterparts;

      b.   Retaliating against her after she raised about Todd Padgett's treatment;

      c.   By firing her.

131.    As a proximate result of Defendant's actions, Coach Loecker has in the past and will in the future suffer injuries and damages.

132.    On information and belief, in discriminating against Coach Loecker, Defendant acted with malice or in reckless disregard of Coach Loecker's rights.

133.    As a result of Defendant's conduct, Coach Loecker suffered loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out of pocket expenses.

134.    The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII including, but not limited to:

      a.   reinstatement of Plaintiff to her position as head coach, or front pay;

      b.   a court order requiring that the Defendant be audited regarding its compliance with Title IX and that any failures or violations of Title IX be immediately remedied by the university,

      c.   that Defendant be required to take steps to not only comply with Title IX, but to provide additional remedies and funding to make up for shortcomings and the failure to make progress as required by Title IX, and

      d.   such other and further relief as the Court deems necessary to effectuate the purpose of Title IX.

**WHEREFORE**, Coach Loecker requests reinstatement; lost wages and benefits;

compensatory damages for loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenient and damage to her reputation, and out-of-pocket expenses; punitive damages, equitable relief; any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purpose of Title IX; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

## JURY DEMAND

**COMES NOW** the Plaintiff, Shanta Loecker, and hereby requests a trial by jury in the above-captioned matter.

NEWKIRK ZWAGERMAN, P.L.C.

_/s/Thomas Newkirk_
Thomas Newkirk AT0005791, *admission pending*
tnewkirk@newkirklaw.com
Danya Keller AT0012300, *admission pending*
dkeller@newkirklaw.com
521 E. Locust Street, Suite 300
Des Moines, IA  50309
Tel:  515-883-2000
Fax:  515-883-2004

and

_/s/ Michelle K. Schindler_
Michelle K. Schindler
mschindler@matthewfergusonlaw.com
119 S. Spring Street, Suite 201
Aspen, CO 81611
Tel: 970-925-6288
Fax: 970-925-2273

**ATTORNEYS FOR PLAINTIFF**