**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-00952-CMA-GPG

SHANTA LOECKER,

  Plaintiff,

v.

BOARD OF TRUSTEES FOR COLORADO MESA UNIVERSITY,

  Defendant.

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO ALTER OR AMEND ORDER**

**Fed. R. Civ. P. 59(e)**

---

**INTRODUCTION**

  The Court's order granting Defendant's motion to strike Plaintiff's expert, Dr. Laura Burton, relies on two faulty premises: First, the order states that Dr. Burton's testimony "would likely distract the jury's attention from considering the evidence as it applies to the issue of whether CMU – rather than student athletes – engaged in discrimination." (Doc. # 81 at 8-9).  Second, the order states that Dr. Burton's expertise "falls within a category of issues an average person can evaluate and understand without the assistance of an expert." (Doc. #81 at 7). Respectfully, these two premises constitute manifest errors of law and misapprehend Dr. Burton's specific area of expertise. Specifically, the first premise is incompatible with well-established law recognizing the "cat's paw" theory of liability in employment discrimination cases. Likewise, the second premise misapprehends core components of Dr. Burton's expertise: (1) college athletic departments and how gender stereotypes can play a role in that specific context; and (2)

1

understanding the specific mechanics of how and why gender stereotypes influence behavior, and how those who report stereotype-free attitudes can nevertheless succumb to stereotypes. As set forth below, even if the concept of stereotypes is *generally* understood by the average person, the complex environment of a college athletics department and the underlying science explaining the effects of stereotypes on decisions are not.

During the course of these proceedings, there will be ample opportunity for Defendants to voice objections to Dr. Burton's testimony, should Defendants have any. For example, after deposing her, Defendants can move in limine to exclude Dr. Burton if they deem it necessary to do so. Likewise, Defendants can voir dire Dr. Burton at trial to challenge her expertise. However, striking Dr. Burton at these early stages of the proceedings is highly prejudicial to Plaintiffs and, for the reasons set forth below, would constitute a manifest error of law. Accordingly, pursuant to Rule 59(e), Plaintiff respectfully requests the Court alter and amend its order and deny Defendants' motion to strike.

## ARGUMENT

### *Fed R. Civ. P. 59(e) Standards*

A motion to alter or amend pursuant to Rule 59(e) may be granted to correct manifest errors of law or to present newly discovered evidence. *See Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997)(Citing *Committee for the First Amendment v. Campbell*, 962 F.2d 1517 (10th Cir. 1992). "A motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law."

*Servants of Paraclete v. Does,* 204 F.3d 1005, 1012, (10th Cir. 2000)(citing *Brumark Corp.*

*v. Samson Resources Corp.,* 57 F.3d 941 (10th Cir. 1995).

### The Court's Order is Incompatible with Prior 10th Circuit Rulings Recognizing the "Cat's Paw" Theory of Employment Discrimination

In its order, the Court states that Dr. Burton's testimony's minimal probative value

is substantially outweighed by its prejudicial effect. (Doc #81 at 8). In support of that

contention, the order states Dr. Burton's testimony "would likely distract the jury's

attention from considering the evidence as it applies to the issue of whether CMU – rather

than the student athletes – engaged in discrimination." (Doc # at 8-9). However, that

contention relies on the faulty premise that these two categories (i.e., CMU and student

athletes) operate entirely independent of one another and the attitudes of one cannot

impact the decisions of the other. That premise is irreconcilable with prior holdings of the

10th Circuit, as well as other Courts of Appeals, which have recognized an employer who

acts without a discriminatory intent can nevertheless be liable for an adverse employment

action when the employer's decision was based on a third-party's discriminatory animus.

In *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles,* the 10th Circuit Court of

Appeals acknowledged an employer can be liable for a third-party's discriminatory animus

if the employer relies on the biased third-party's reports when making an adverse

employment decision. 450 F.3d 476 (10th Cir. 2006).  In that case, an African-American

employee was terminated by a human resources official who worked in a different city

than the employee, had never met the employee, and did not know the employee's race.

*Id.* at 477. However, the human resources official's decision to terminate the employee

was based on information provided by the employee's immediate supervisor, who was

alleged to have a history of treating African-American employees less favorably. *Id.* Under

the "cat's paw" theory of liability, the Court held that an employer can be liable for discrimination when a biased subordinate's discriminatory reports, recommendations, or other actions caused the decision-maker to take an adverse employment action, even if the decision-maker had no discriminatory animus. *Id.* at 487. The Court' holding demonstrates that, when an employer's employment decisions are influenced by complaints or reports from third parties, understanding whether those third-party complaints or reports were born of discriminatory biases is crucial.

The Second Circuit Court of Appeals has applied the cat's paw theory in the specific context of an adverse employment action taken by university as a result of complaints made by a student. In *Menaker v. Hofstra University*, the university fired its head tennis coach after the university received sexual harassment complaints from a student-athlete about the coach. 935 F.3d 20 (2nd Cir. 2019). Following his termination, the coach filed suit against the university pursuant to Title VII and related state law claims, arguing, *inter alia*, that the student's complaints were motivated by the coach's sex, and, under the cat's paw theory, the university could be held liable. *Id.* at 37.  On appeal, the Second Circuit held that the university could be liable under the cat's paw theory and specifically directed the district court on remand to consider the coach's case under that theory of liability. *Id.* The Second Circuit explained, "the discriminatory intent of a student-athlete may also be imputed to a university where that university exercises a high degree of control over the behavior of the student and negligently permits her discriminatory conduct or effectuates her discriminatory intent." *Id.* at 39.

Thus, the foregoing cases demonstrate that, in the context of Title VII actions, the discriminatory proclivities of university officials and student athletes do not exist in silos.

And, when a university's employment decisions are based on complaints by student-athletes, it is necessary to determine if those complaints were the result of discriminatory animus. As a consequence, the Court's order on Defendant's motion to strike is untenable. The Court's order presupposes the existence of an impenetrable partition where on one side stands CMU officials with their motivities and on the other stands student-athletes with theirs. Neither the foregoing holdings, nor the facts of this particular case, support such a construct. As set forth in Plaintiff's complaint, during the phone call where she was informed of her termination, Plaintiff was told "there had been complaints from players and parents regarding [her] coaching methods." (Doc. #1, at 14). Plaintiff further alleges double standards among male and female coaches "result in student-athlete complaints that are the direct result of gender bias" (Doc. #1 at 2).  Therefore, even to the extent her testimony will focus discrimination among student athletes, that testimony is directly relevant to, and highly probative of, the precise issue presented in this case. As such, the Court's order relies on a manifest error of law and must be amended.

### The Court's Order Misapprehends Specific Components of Dr. Burton's Expertise that Falls Outside the Category of Issues an Average Person Can Understand

The Court's order also concludes that gender stereotypes are within a layperson's common knowledge and Dr. Burton's expertise therefore "falls within a category of issues an average person can evaluate and understand without the assistance of an expert." (Doc. # 81 at 7). In support of that conclusion, the Court cites several cases where courts have excluded the testimony of experts who were offered to testify about stereotypes generally. However, those cases are inapplicable to Dr. Burton's expertise, which

specifically focuses on athletic departments and the complex, and often subtle, influence of gender and racial stereotypes in those departments and among student athletes.

For example, the Court cites *Smith v. Colorado Gas Co.*, in support of the conclusion that an average person can understand the concept of stereotypes. 794 F.Supp. 1035 (D. Co. 1992). In *Smith*, a Vietnamese, female employee alleged she was terminated because of her race and gender. *Id.* The employee offered experts to testify about the biases of Americans against Vietnamese and/or Asian- American. *Id.* The Court, however, concluded "gender and race discrimination are issues and average person can understand an evaluate." *Id.*

Unlike the experts in *Smith*, Dr. Burton, a professor at the University of Connecticut's Sports Management program, is an expert in collegiate athletic departments, and the pervasive influence of stereotypes within those departments. Dr. Burton is not merely an expert on the general concept of stereotypes, but rather an expert on the specific issue of collegiate athletic departments, and the influence of gender stereotypes in college athletics. Thus, while the average person may be aware of general notions of stereotypes, the unique and complex environment of college athletic departments, and the influence of stereotypes within that environment, are not generally understood, and a jury would therefore greatly benefit from Dr. Burton's expertise. Indeed, most jurors will not have direct exposure to, or involvement with college athletic departments. As Dr. Burton explains in her report:

> "Sports in the United States is considered a masculine domain and participation in sport is perceived as a place to construct boys and men to demonstrate, value and reproduce traditional ideas of masculinity. Further, competitive sport (including Division I intercollegiate athletics) serves as a social institution that defines certain forms of masculinity as acceptable. These

> acceptable forms of masculinity include being exclusively heterosexual and physically dominant and support denigrating anything that is not such. Women in this place of high-level competitive sport are often situated as "other," marginalized, or not belonging, and their presence as athletes, coaches, fans, managers or leaders, is under constant scrutiny."

(*Burton Expert Report*, P. 3). Thus, college athletic departments are unique from other employment environments and the average juror would benefit greatly from expertise on the specific influence and effect of gender stereotypes in these unique environments.

Moreover, while gender stereotypes in the workplace, as a general concept, may be understood by the average person, the Court's ruling misapprehends a central component of Dr. Burton's expertise: the effects of gender stereotypes and the specific mechanics of how and why gender stereotypes influence behavior. As Dr. Burton explains in her expert report, her expected testimony includes "how gender bias and gender stereotypes, and the intersection of racial bias and gender bias, operate in a work organization including in a college athletic organization." As Burton explains in her report:

> It is important to note that gender stereotyping often occurs implicitly, with individuals explicitly reporting stereotype-free attitudes while succumbing to stereotypes during implicit measures. Therefore, though individuals may claim that stereotyping does not impact how they react to, perceive, or treat others, stereotyping can still influence how they react to, perceive, or treat others.

Thus, Burton's expertise is not focused solely on common stereotypes about gender. Rather, a central component of her expertise is the manner and method by which these stereotypes influence relevant actors. By analogy, the Court, the lawyers, and the jury all *generally* understand bacteria or viruses. We all know that, like stereotypes, they exist and can cause harm. We might even understand why we need to cover our mouths

when we cough and wash our hands. What most of us likely do not fully understand, however, is how, when, and in what specific way, a virus works on the body, or how it can transfer in air or on objects.  We know harm can occur, but understanding why one person gets very sick, another gets a little sick and another has no symptoms, is far more challenging without expert help.  Even assuming, *arguendo*, that gender stereotypes are generally understood by the average audience, the *complexity of the manner and method by which those stereotypes influence behavior* is not.

The Court is correct that there is also direct evidence of garden variety sexism in this case expressed by two key decision-makers (Mort and Rooks) that will not be difficult for the jury to understand. For example, as noted in the Complaint in paragraphs 55-58:[1]

- One of the first red flags Coach Loecker noticed (beyond the general lack of diversity) when she arrived at CMU was that her predecessor (also a woman) was regularly and openly spoken of in a stereotypical and negative manner (e.g., she was "volatile," "emotional," "loud," etc.).

- During one of these instances, in the fall of 2018, Co-AD Mort (the only female in the athletics department) told Coach Loecker that if she could get away with hiring only men, she would because women are "too emotional" and "difficult."

- This was a sentiment that Co-AD Mort would express more than once during Coach Loecker's tenure at CMU.

- Mr. Rooks also made numerous comments implying that it was harder for administrators to manage female coaches than male coaches because coaching was a better fit for males.

With respect to these overt expressions of gender stereotypes, expert testimony is not necessary. However, these two decision-makers have also claimed that it was the

---

[1] Plaintiff also confirmed this in her deposition.

complaints of athletes that motivated their decision to terminate Plaintiff's employment. As noted earlier, the manner and extent to which stereotypes and discriminatory views influence these complaints is directly relevant to the present case. It is still challenging for a lay person to process how and why female athletes are influenced by stereotypes about their female coach, as well as how those stereotypes may operate. Dr. Burton's testimony will provide jurors with a crucial understanding of these complex issues.

Defendants' objection to Dr. Burton's testimony demonstrates why her testimony is so necessary. In absence of necessary education, one may unwittingly believe they understand particular topics. It is only after being appropriately educated that one often appreciates their prior ignorance on a particular subject. As such, a jury in this case would benefit from Dr. Burton's expertise to understand the complex, and often subtle means by which stereotypes influence behavior.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests the Court alter and amend its prior order (Doc. # 81) and deny Defendants' motion to strike Dr. Burton's report and testimony.

*/S/Thomas Newkirk*
Thomas Newkirk AT0005791, admitted
tnewkirk@newkirklaw.com
Newkirk Zwagerman, P.L.C.
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Tel: 515-883-2000
Fax: 515-883-2004

Michelle K. Schindler
mschindler@matthewfergusonlaw.com
119 S. Spring Street, Suite 201
Aspen, CO 81611
Tel: 970-925-6288

Fax: 970-925-2273

ATTORNEYS FOR PLAINTIFF

PHILIP J. WEISER
Attorney General
ELIZABETH PHILLIPS, No. 46486*
LAUREN DAVISON, No. 51260*
Assistant Attorneys General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
(720) 508-6568; (720) 508-6361
elizabeth.phillips@coag.gov
lauren.davison@coag.gov
*Counsel of record

ATTORNEY FOR DEFENDANTS